is now open. The Honorable Justice George Bridges presiding, along with Justice Susan F. Hutchinson and Justice Catherine E. Zenoff. The case is number 219-0831, People of the State of Illinois, Plaintiff's Appellate v. Alejandro Gonzalez, defendant appellant. Arguing for the appellant, Jack C. Flingerland. Arguing for the appellee, Barry W. Jenkins. Good morning. Are both parties ready to proceed? The appellant is ready to proceed, Jack Flingerland. Yes, Judge. Then, Mr. Flingerland, you may proceed. Thank you. Good morning, Justices. Good morning, Counsel. May it please the Court? I'm Jack Flingerland. I'm Alejandro Gonzalez's attorney. Alejandro is the appellant. Justices, Alejandro Gonzalez should not be in the Illinois Department of Corrections. He should not be in the Illinois Department of Corrections because he was not proven guilty beyond a reasonable doubt. He did not receive effective assistance from counsel, and he did not receive a fully legal transfer hearing from juvenile court to adult court. I'd like to begin on that point, the discretionary transfer hearing. At the hearing, the probation officer for DeKalb County testified that it's his routine in his probation department that when they have an offender charged with a sexual offense, that they routinely commence a sex offender evaluation. They don't do it themselves. They send it out to a psychologist for sex offender evaluation. Then the probation department does a social history investigation. Neither of those were done in this case. The probation officer, Mr. Venditti, testified that one of the results of the sex offender evaluation is a determination as to whether the community-based services for sex offenders are available to this offender or whether it would just be too dangerous to the community to allow community-based services to be rendered to the juvenile. The purpose of the transfer hearing is to balance the best interest of the juvenile, particularly as to his potential for rehabilitation against society's interest in protection. However, in this case, when the juvenile court judge was commenting upon the evidence, the statement was made that, quote, is there a juvenile court jurisdiction? Again, there is simply no information to suggest that he can be rehabilitated within two years' time. The issue before the transfer judge was that the defendant was 19 years old at the time the judge opined that it was only two years more of juvenile jurisdiction. Nevertheless, the probation officer testified that in certain circumstances, a person could complete sex offender evaluation within the time period remaining in the juvenile court jurisdiction in this case. So the judge had before a possibility that he could complete sex offender evaluation within the time period. Had the resource available of a sex offender evaluation, it did not have that presented to the court. Under the case of People v. Clark, the juvenile court judge can order an investigation, can order additional evidence be presented to the court on any either statutory or non-statutory factor if the court deems it necessary to make a proper decision. So in this case, justices, Mr. Gonzalez did not receive a fully legally complete transfer hearing because there was no information, in the words of the judge, no information on one of the statutory factors. That is, is there a possibility that the defendant can be rehabilitated within two years' time? We quoted from, in our brief, we quoted from Graham v. Florida, the U.S. Supreme Court, that juvenile offenders are less deserving of the most severe punishment. The issue before the court here, as the court was reminded, was that there's two years left in juvenile court jurisdiction. However, the defendant was facing 10 counts, each with a six-year minimum, for a total of 60 years. So there was quite a dilemma and quite a decision facing the judge, but nevertheless, the Illinois Supreme Court and buffer has related that juveniles are more capable of change than adults, and again, they're less deserving of the most severe punishments. Mr. Gonzalez did not receive effective assistance to counsel. Mr. Gonzalez, at the time he was questioned by the police, was 15 years old. The night of the questioning by the police was preceded by the family of the children going to Mr. Gonzalez's home in the presence of his parents. The father of the children began a rant, screaming angrily at Mr. Gonzalez, at the defendant. There was a chair thrown across the room, there was a table pushed in his direction, and there was much shouting, much anger. When the police arrived, he was questioned in the presence of his parents, but he had been through the rant by the father, by the uncle, I should say. In addition, Mr. Gonzalez, as was in the record, had a history of mental difficulties. Just four months after the police questioning, he was found unfit to stand trial. In addition to this history of mental health, he had no prior experience with the criminal justice system, and he could have been emotionally drained and mentally unstable at the time that the police questioned him. Remember, he was at work, he came home, and was confronted immediately by an angry uncle, by an angry uncle and aunt. Yet, given the circumstance, the defense attorney did not pursue a motion to suppress. Now, I understand that a motion to suppress sometimes can be deemed as a matter of trial strategy. However, in this case, it's not, because we have the direct testimony of trial counsel at a post-trial hearing, when asked, well, what was the downside to filing a motion to suppress evidence? The answer that the attorney gave was that, well, if this was going to be the judge that was going to hear the case, I did not want this judge to hear this evidence. So as a result, as a result, there was no hearing on whether the statement that the defendant gave was voluntary. The judge was going to hear the statement one way or the other. If there was no motion to suppress, the judge was going to hear the statement by the defendant in the course of the trial. And indeed, it was there was no motion to suppress file. It was not pursued under some theory that she didn't want the judge to hear it if the judge was going to hear the case. Therefore, Mr. Gonzales did not receive the benefit of an attorney who worked to make sure that only admissible evidence was admitted at the trial. That is, only make sure that only voluntary statements were There was no attempt to do that, and it can't be viewed as a trial strategy when the statement made no sense. And it was contrary to Mr. Gonzales' best interest, again, to have only admissible evidence admitted at trial. Mr. Gonzales' mental condition at the time, there was testimony that he'd been hearing voices in the past, that he was at suicidal ideation from time to time, and that he's just not stable, stable given his age and his history. Mr. Gonzales is not proven guilty beyond a reasonable doubt. The testimony, the evidence primarily of the testimony of the two young children, Marco and Bianca. There's no corroboration for any of their statements. The attempt to corroborate the statements by having a physical examination performed was not truthful. The nurse practitioner who performed the evaluations on the children was not able to conclude that the children's symptoms and medical condition was a result of sexual victimization. The statements of the children were recorded a few days after they first reported the incident to their parents. The purpose of those recordings is to have a recollection, have testimony that's most fresh in the minds of the children. However, the testimony, the recordings that were made a few days after the disclosure varied wildly from the testimony of the children at the trial. Years later, they were inconsistent, unreliable, and improbable according to the events that they testified to. The young man, Marco, testified that he called three instances. This was on the tape a few days after the disclosure. He said that it happened the first time and one other time. The girl, Bianca, didn't specify a number. As a matter of fact, said she couldn't remember much at all about it. Marco, at first, would ask what happened, said, I don't know. I don't remember. It was his first statement to his parents the night of the disclosure. The trial testimony was, again, influenced according to the children's own statements by the parents. Marco testified that he had remembered the events with the help of his parents. He also testified that he discussed the case with the prosecutor. Obviously, the prosecutor suggested words that could be used in his testimony. By his own statement, he didn't recall much of anything beyond the two or three times that he talked about. Now, Bianca twice denied that anything occurred. She denied it to her parents. Her mother testified that she asked Bianca, have you been inappropriate with an adult or with an older brother, and she denied it. There was a medical records person that testified that there was a notation in the medical records of a medical exam done about three or four days after the disclosure where Bianca was asked flat out, has anyone touched you inappropriately, or have you been made to do something that you did not want to do, and the notes indicate that Bianca denied that was the case. In the larger picture, the state's evidence is that for, according to some testimony, for an ongoing period of time, two or three years, these families... Counsel, I apologize for interrupting you, but your time has elapsed. Please finish this last statement. Thank you. Very good. Thank you, Justice. I'll leave it there. I'll save it for rebuttal. Thank you. Thank you. Justice Hutchinson, do you have any questions? Yes, I do. Thank you. Counsel, did the attorney for your client in juvenile court request a sex offender evaluation? No, Judge. No, Justice. Okay. And so the only discussion of that was from the juvenile probation officer, basically? Yes. Okay. When Judge Buick was making her findings, one of the issues that should be talked about is the difference in the punishment or in the rehabilitation efforts of the descendant, the juvenile. Did she even talk about a possible sentence in adult court in her comments and in her findings? She made a comment on it. I can't tell you that she made a comment in her findings, but it was a topic that Judge referenced during the hearing. Yes. Right. There is a case, it's an older one, but still a valid case, People v. Clark, where the Supreme Court was unhappy and reversed a voluntary transfer in saying that there was not even any discussion of a possible penalty in adult court. Do you think this decision would apply to your client's case? Absolutely, Justice. And we argued that in our brief that under People v. Clark, a court has the ability to order further investigation if the court believes that it's not possessed with the sufficient information to make a decision, either statutory or non-statutory factor. Again, the likelihood of rehabilitation is a statutory factor. And Judge Buick indicated there is no information to suggest it can be rehabilitated within two years, no information, when it was easily available through a sex offender evaluation. She made another comment that I'd like you to talk about. She said that because this young man had not had any previous contact with the system, he had not been offered any services by the system. As a result of that circumstance, she found that it was, she didn't know if he would respond well, take well, do what he was supposed to do, and therefore she found those services or this fact to be very important. What about that issue? Wouldn't that statement be somewhat inconsistent with the purpose of juvenile justice, as well as any sort of punishment in adult court? Yes, Justice, I agree. Just because Mr. Gonzales did not have any prior contact with the system does not mean no one will ever be able to speculate as to whether he would benefit from the services. There's ways to determine that, that the probation officer testified to, that we do it all the time. And through not only a sex offender evaluation, but a social history investigation would reveal whether he was likely to benefit from the services offered. All right. Let's talk a little bit about ineffective assistance. Maybe not filing the motion to suppress could be considered a strategy, and we'll not talk about that at this point, but the real issue, at least in my mind, is what were the prospects of such a motion being granted? The officer did not have an interview, which would be required, or at least the interview should occur with their permission. It was in his own home, a place where one would seem more comfortable than in the police department or in the uncle's home. Even after the conversation with Officer Meeks, he was not taken into custody. So don't we have a problem of whether, in fact, number one, this was even a custodial interview that Officer Meeks then turned over to the detective division? Justice, I would agree. I don't believe that it has the earmarks of a custodial interrogation for the reasons that you cite. However, the question is not, the overall question is the voluntariness of the statement, whether it's in custody or not. If it's not a voluntary statement, it doesn't go into evidence, even if it's not a custodial situation, as you're aware. Our argument, our belief is that, given the circumstances of the case, his age, his mental condition, the fact that he had just undergone a tongue lashing by the uncle, the fact that there was furniture tossed in the room while the uncle was yelling at him, all were factors that a trial court hearing a motion to suppress could have considered under the totality of the circumstances as to whether it was a voluntary statement. All right. Dr. Braden, Dr. Braden's report came after this conversation with Officer Meeks. But now looking at that report in considering this motion or whether this motion would have been granted, didn't Dr. Braden find that your client was, should stay with his parents, he was very concerned that his father served as sort of an anchor for him. And so wouldn't we take that into account even though he had this unfortunate confrontation with his uncle the night before? Yes, Justice. Dr. Braden indicated that in terms of inpatient services or outpatient services, that Mr. Gonzalez would be appropriate for outpatient services, given that he is still residing at his home. And that would be the best arrangement for him to benefit from any counseling or services. But I'm talking about the actual motion. Now, your position is that because of what happened the night before this motion, it would be hard to find this motion to be voluntary or his statements to be voluntary. Well, he's in the presence of his father, who we know from a later report, but one that we can now consider that he's very comfortable with his father. It would be the best place for him pending trial unless they could find inpatient services. So shouldn't that be factored into what occurred the night before? There's no doubt his father and his mother were present when he was being questioned by the police. He was in his own home. Those are all factors that would weigh toward the voluntariness of the statement. However, we believe there are substantial factors that the judge was not able to consider because of the failure to file the motion to suppress. Okay. And let me ask just one or two questions on the beyond a reasonable doubt. The appellant or your client did, in fact, admit to Officer Meeks that there had been some inappropriate conduct, but he didn't know what was wrong because it had happened to him, I think is, I'm paraphrasing, but it's generally what he said. Did he indicate how many times he recalled this occurring? No, Justice. He was not asked, nor did he say how many times it happened. All right. So when we got this statement from him, he was sort of offering the information as opposed to answering a specific question? That's accurate. The police officer just said what happened and kind of a vague statement was rendered. There was a statement by Mr. Gonzalez that he may have acted inappropriately, but the police officer testified that he may have sexually assaulted him. But across examination, the officer was asked, well, is that what he said? He said, no, those are my words, sexually assault. Okay. All Mr. Gonzalez said was inappropriately touched, or touched, I should say. All right. The next question that I have goes to both ineffective assistance and beyond a reasonable doubt. Did trial counsel ever request in writing or otherwise a bill of particulars concerning the times and places of these events?  She did file some sort of a motion to dismiss the indictment, though, and then that was dismissed just before the end of trial. Did that in any way cover the issue of the breadth of the time period? There was a statement by defense counsel that it's hard to pinpoint. Perhaps this was after the post-trial motion. It was hard to pinpoint the exact time frame is what she testified to at the post-trial motion, but the motion that she filed ultimately was not pursued. You're correct. Okay. This indictment covers August 18th of 2013 to May, as amended, May 9th of 2015. Yes. There is testimony in this record that the old house or the blue house, as the children referred to it, was a place where some of these events had occurred. However, your client's father produced a deed that said that house had been sold 11 months before the dates on this indictment started. How does this fit with Beyond a Reasonable Doubt and what the children said? Well, I don't think, with all due respect, Justice, I don't know that that mitigates against events that allegedly occurred within the period of the indictment. The fact that there was some evidence from Marco, from the young man, that events occurred at the blue house or the old house, I don't think that fits within the time period in the indictment in any event. Right. Right. Now, in the end, the judge found all the witnesses to be credible, particularly the children. I mean, if that blue house is sold in 2013, I'm sorry, in 2012, and the indictment period doesn't begin until 11 months later, how does this finding everybody credible make any sense in this case?  The comment that I can make on that is that the children gave basically three different versions, three different times of what happened. The number of times, the places it happened, how it happened, who was there, et cetera. If the children credibly testified under oath at the trial, then their statements earlier could not be credible because they're contradictory. So the statement that the children, that the court found the children's statements to be credible, I guess you'd have to say, well, which statements were credible? And if those were credible, then the other statements cannot be. All right. One last question. Counsel, you did not challenge in your brief, and I don't believe it was challenged at the trial court, the sentence that was imposed in this case, taking a six-year mandatory and the trial judge actually cutting that in half. Why didn't you challenge that? The state had challenged it, and the mandamus was denied by the Illinois Supreme Court. I believe that's going to be the subject of a supplementary proceeding. At least the state has indicated that's their intention, as well as it's noted in the people's brief in this case that there's going to be, that they contemplate a subsequent hearing on that issue. I think it's an intriguing issue. Probably is coming up quite frequently nowadays, but it's not coming up, hasn't been briefed in this case. It may be briefed in other cases because this issue is bound to recur. Okay. But you did not do it because there was this supplementary or this other proceedings already in process? That's correct. Okay. All right. Thank you very much, Mr. Slingerland. Justice Bridges, I have no additional questions. Thank you, Justice Hutchison. Justice Zinoff, do you have any questions? Well, just a few. Justice Hutchison did cover the three pages of questions, and she very kindly was very comprehensive and covered most of them. I have just one or two. The court did say that it took all case law into account in its decision to transfer, and the Miller case had been tendered to her. Isn't that correct? Yes, Justice. So how can we say that the principles in Miller and Buffer were not taken into account here? She made reference to the Miller case, and she did not specifically make reference to the Buffer case. She did not specifically indicate that she took into account that juveniles are less deserving of punishment, severe punishment, than adults are. She did make reference to the fact that the cases were cited to her. Yes. Okay. You started out and throughout your argument made the point that this transfer hearing was not legally complete because, and you outlined the shortcomings that you believed were part of it. My question is, the statute does have the word shall, and it indicates that a court in conducting a discretionary transfer hearing shall consider, among other things, and then lists, of course, the number of factors. The release that you request in your brief is that we reverse the decision below to transfer the proceedings to criminal court and or to reverse the trial court's judgment of conviction. With respect to the first request, if we were to reverse the decision to transfer, what are you suggesting happens next? Well, he would be, at this point, he's beyond the jurisdictional age for juvenile court. It is a dilemma. So, in essence, his sentence would have been deemed served then? I mean, there aren't any further proceedings that can happen in juvenile court then? That's correct. The sentence would be deemed served. Yes, Justice. I see. Okay. Honestly, I think, as I said, Justice Hutchinson was very comprehensive and asked all the questions that I had. So, I do not have any further questions at this time. Thank you, Justice Inhofe. I have a few questions. Counsel, you know, getting to what Justice Hutchinson was talking about with respect to the Blue House, let's assume there were inconsistencies between M.G. and B.G.'s trial testimony and their out-of-court statements. Here, the trial court made credibility determinations as the fact finder and found their testimony credible. What evidence is there before us to enable this court to find their testimony was so improbable or unsatisfactory as to create a reasonable doubt of their guilt? Justice, I answered the previous Justice's questions. I don't want to repeat myself, but basically, if one statement by a minor is credible, then the other statements are not credible because they contradict. The young man said, I don't remember what happened. He said it happened maybe five times, maybe ten times, maybe twenty times. And on occasion, he said it happened three times, the first time, the last time, and one other time. He said it happened in the Blue House, it happened in the Yellow House, it happened every weekend, it happened sometimes. All those statements cannot be true. The same can be said for the young lady, for Bianca. She did not have a number, she did not mention a number. She just mentioned, well, it happened once in fifth grade, once in sixth grade. It happened every weekend, but sometimes maybe not every weekend. Again, they're in a mobile home with four adults down the hall. And the state's case is that this happened when the children were inappropriately assaulted while their parents were a matter of feet away, I suppose, in a mobile home every weekend. And Ms. Hanson, let's get to the issue on the motion to suppress. Ms. Hanson, she testified she found no merit in continuing with her motion to suppress defendant's statement because there was no Miranda violation and it appeared to be voluntary. Yet you argue in your brief that defense counsel should have known the defendant had been traumatized and emotionally drained. You talked about the chair, and that's in your brief, the throwing of the chair. But there was some time before the officer arrived to, in fact, have the defendant make the statement that it was true. Isn't that correct? I do believe that. There was not a time reference, but the facts, the pattern of facts, the parents went to the police department and the police came over to the other house. There was a period of time, yes. So what evidence do you have that he's emotionally drained and traumatized? The circumstances that was described with the throwing of the chair, the rant, the father, the uncle himself testified, I was mad, I was angry. And then there was other testimony, the chair was thrown, furniture was thrown, they were yelling at the young man. That coupled with, again, just four months later, he was found unfit to stand trial. He did have a history, according to Dr. Braden, of some psychological issues coming in. He was on medication for a period of time. He had suicidal thoughts. He felt hopeless despair. So there was an issue there of his ability to render a voluntary statement under the totality of the circumstances. Yeah, but he's in, as Justice Hutchinson said, and there's some time now because the uncle has left before Meeks arrived. Where's the evidence? I mean, how do you establish there's reasonable probability that the statement would have been suppressed based upon the facts that we have before us? Well, the attorney said not only I didn't think it would be successful, but I didn't want the judge to hear the statement, which is not a matter of trial strategy. It's an incorrect assessment. Of course the judge stated in the statement either he had a motion to suppress or left the trial. That's not effective assistance, I can tell you. Okay. All right. In getting to the sufficiency of the evidence, based upon the case law, force can be established by a number of different factors. Isn't holding and pinning one down by their waist sufficient to show the use of force to support the charge here? The statement by the young man was that I couldn't get away because he was bigger than me. There was a statement that he did hold the young man by the waist. In my brief, I simply made a reference that force must be something other than what is part of the crime itself, a natural part of the crime, without getting too particular on it. It can be argued that in order to accomplish what was described as sexual assault, that it was part of the sexual assault that the person hold on to the person's waist. I don't want to get too particular on it, but that's what I argued in the brief. The young lady, the force is an element to the young lady, so it's just the young man. That was the testimony, yes. Okay. As Justice Zinoff indicated, both Justice Zinoff and Hutchinson covered a number of the questions that I have, so I have no further questions at this time. Justice Hutchinson, do you have any additional questions? No, thank you, and I apologize for stealing everybody else's questions. You know what? That's fine. As long as we cover the bases, I think that's the essence, so no problem. Okay. Amen. I appreciate it myself. Well, Justice Zinoff, do you have any further questions? No, I don't. Thank you. Thank you. Thank you, Mr. Singerland. At the end of the Appellee's argument, you will have an opportunity for rebuttal. Thank you. Thank you. At this time, Mr. Jacobs, you may begin your argument. Good morning. I'm Barry Jacobs on behalf of the Legal Disabled and Appellee in this case. I wanted to speak briefly about the sentence imposed by the trial court and next steps this court affirms today. As was referenced in response to Judge Hutchinson's questions, the record shows that the court here granted the defendant's motion to reconsider, finding that the statutory mandated aggregate sentence of 60 years was an impermissible de facto life sentence. The court concluded that the 60-year term violated the Eighth Amendment and could not stand under people versus buffer. The court then imposed a new 35-year aggregate, 3.5 years on each count, sentence that did not conform to the statutory requirements. Based on the court's finding that the required minimum sentence violated the Eighth Amendment, the state, as Mr. Singerland referenced, did appeal to the Illinois Supreme Court. But because the court did not make the requisite findings of unconstitutionality under Rule 18 with regard to the statutes involved, the Supreme Court declined the appeal. Should this court affirm the defendant's conviction, would people intend to pursue the only remedy available, which would be for the issuance of a writ of bandanas, directing the court to impose the mandatory 60-year sentence? If your honors have questions about that, I'll attempt to answer them. If not, I'll turn to the issues raised. Mr. Jacobs, could you speak up just a little bit? Thank you. Do your honors have any questions about the writ of bandanas? No, thank you. So are you done, Mr. Jacobs? Oh, no, I'm sorry. I was just pausing. I'm turning to the issues. Continue with your argument. Thank you. I'll answer the second issue, which was the first one addressed. If the court does not use discretion in granting the statute of limitations to the juvenile court, the procedure employed hereby adjusts the unit to satisfy the basic requirements of due process and fairness in complying with the statutory requirements set forth in Section 5805 of the Juvenile Court Act that the juvenile court conduct a formal investigation. The transgression included seven days before the defendant's 19th birthday on May 3rd, 2017. As I noted in my brief, after hearing evidence of the defendant's past history, including his school records, various reports, his covenants, his mental health, treatment, subsequent to being charged with the incident offenses, the legislative history of the transfer statute, the relevant case law, including Miller v. Alabama, all those things were tendered by defense counsel and admitted as evidence considered by the court. Police reports regarding the offenses and the recorded interviews of Marco and Bianca were also tendered, and the defendant offered the testimony of Dr. Gene Brayden, who had found the defendant unfit due to his depression, and he recommended inpatient treatment for the defendant. In rendering the decision on the motion to court transfer, the juvenile court discussed the statutory factors as well as the potential term of defendant serving as an adult. It was argued in front of Judge Buick by the state that these were serious offenses that should subject the defendant to serious consequences, and the court apparently gave great weight to the circumstances of these 10 felony offenses. The court observed the treatment programs for sex offenders to get submitted in both the juvenile and adult systems as required by the statute. The court also considered the testimony of court services probation officer Michael Menditti, indicating that there was no inpatient residential treatment available in juvenile court for the defendant who was over the age of 18. As I said, he was nearly 19 at the time of this hearing, and I think it was May 3, 2017. Michael Menditti also explained that the evaluation of the defendant for services that had not been done could not be accomplished for up to nine months. Thus, the services available under the juvenile court services were not superior to those in adult court available for approximately 15 months after the evaluations were completed. The record, as I said, shows that the court also considered the non-statutory factors that the defendant faced a substantial sentence between 60 and 300 years if convicted of all counts. In summary, the record shows that the court considered all evidence of potential services in light of the defendant's history and present condition, finding that juvenile services were inadequate to achieve rehabilitation of the defendant before the expiration of the juvenile court jurisdiction. As permitted by the transfer statute, the court gave great weight to the circumstances of the offense. People assert that in the absence of a contrary evaluation, stating that the defendant was at low risk for re-offense, and it clearly did not happen here. The circumstances of the offenses, the repeated sexual assault of these minors over a multi-period, did not vote in favor of the court finding that rehabilitation of the defendant could be accomplished within the limited time frame before the defendant turned 21. This court should find that the record supports the decision to transfer the defendant's case to criminal court, and the court did not view the discretion of striking the balance in favor of society and against the defendant in transferring the case. On the issue of reasonable doubt, under the applicable standard of view, this defendant was proved guilty beyond a reasonable doubt in each of 10 counts of aggravated criminal sexual assault as alleged in the indictment. Essentially, the defendant, on appeal, urges this court to re-weigh all of the evidence and to discount the minor's testimony about the frequency, location, and time frame of contact between him and the minors. The defendant argues that because Marco's trial testimony was specific and detailed, and the statements he made after the outcry, his trial testimony was not believable. Marco did make statements about abuse occurring in the Blue House. He also made statements that the abuse had begun when he was in preschool. Marco also explained his reluctance to speak about the incidents, which is visible in his video testimony with Investigator Tunney, and that he only felt comfortable disclosing as he remembered, became more assured that his parents would not be mad at him. Marco also made changes in the minor's terminology, which is how it refers to making the testimony incredible. It was also explained by the minor's mother, Rihanna, who indicated that in-depth conversations had been had in the proper terms had been explained to the minors. Marco testified credibly, as the court found, that there was contact with the defendant and his family almost every weekend. Marco identified the place of abuse as his aunt's room and the defendant's room. Marco testified that the defendant placed his penis in Marco's anus more than ten times at the New House, the Yellow House, during the relevant time period. Marco testified that the defendant penetrated his anus more than five times when Marco was in fourth grade. Marco also testified that the defendant put his penis in her butt when she was eight years old in second grade, plus every weekend that her family visited the defendant's house. The fact finder was entitled to accept as much or reject as much of Marco and Bianca's testimony regarding frequency, locations, and time as it pleased. Concerning all the evidence under the appropriate standard of review, this court should reject the defendant's challenges to the efficiency of the evidence and should confirm his convictions on that basis. Thank you, Mr. Jacobs. Justice Hutchinson, do you have any questions? I wasn't quite done, but that's okay. Oh, no, I thought you were done. You still have time, so continue with your argument. I was just going to turn to the third issue raised regarding the effects of persistent trauma for not having a motion to suppress. The defendant has demonstrated that counsel had mandatory spaces to file motions to suppress voluntary, quantitative, and stainless-steel, and that had counsel left, there was a reasonable probability that Marco would have suppressed the stainless-steel motion and that the resulting plan would have been more effective. Based on March 21st, 2019, the trial court did conduct hearings on the defendant's post-trial motions, which raised issues with counsel's ineffectiveness. Counsel testified that she chose not to file a motion to suppress the defendant's statements to Officer Meeks because the defendant was 17 years old at the time, was at home, was not in custody when he talked with Officer Meeks, the defendant's parents had assented to the conversation and were present, and the defendant was not arrested that night after speaking to Officer Meeks. Counsel did not recall any evidence to support an argument that the defendant was threatened or mistreated by Officer Meeks, and testified that the defendant never indicated to her that he did not understand the circumstances of Officer Meeks' investigation on August 11, 2015. Based upon her review of the evidence with all the case law, counsel believed that filing a motion to suppress the defendant's statements would have been futile as the evidence showed that the defendant made disclosures to Officer Meeks knowingly and voluntarily. This court should find the defendant has failed to show that counsel was deficient for not filing a futile motion to suppress the statement of Officer Meeks. And I'll conclude with that. Thank you. Justice Hutchinson, do you have any questions? Yes, I do. Thank you. Mr. Jacobs, Judge Buick did talk about serious consequences, serious offense. I don't recall her ever talking about, you know, 6 to 30 or anything like that, or up to 300, which happens in some of the other cases. Are you telling us or are you trying to tell us that the concept of serious consequences meets the burden set by Clark and Morgan, that there should be specific reference to the penalties and possible rehabilitation in the adult system? I'm, I guess, trying to argue that, yes, the court's reference to serious consequences did fulfill the requirements of Clark or are distinguishable from Clark. In fact, the state had argued exactly that, that the defendant faced a 6 to 300-year or 60 to 300-year aggregate sentence in this case, and the court's not actually giving those numbers. The state's position does not show that the court did not consider this, or she did say that she considered the serious consequences and that he would face an adult court. In fact, the serious consequences that she might have been talking about, and here's the problem I'm having, ended up not being the same consequences that were actually imposed. How does that work? Or how do we justify that? I guess I'm not understanding your question completely. Well, if in fact the state argued 6 to 300 or whatever they argued, that's not what happened. What happened was you got three and a half years per charge, which certainly for a 19 or 20-year-old is not the best, you know, is not what they were hoping for. But, you know, the two judges don't seem to be on the same page. Is that any problem here? As far as the transfer hearing, I would say no. At that point, Judge Buick would have no way of knowing that later at sentencing or following sentencing, the sentencing judge would impose a nonconforming sentence that was not within the 60 to 300-year range. So Judge Buick simply acknowledged that that was the potential range, and she understood that that was a serious consequence for serious conduct by offenders. Well, she never actually says that he will go to prison and he could go to prison for 6 to 30 years. She just says serious consequences. How does that fit, especially the standards set by Clark? I'm not entirely clear that Clark says that the judge had to give this specific term base. And as I said, the state argued explicitly that this is a 6 to 300-year potential sentence. So according, repeating that the consequences were serious, it's the only interpretation that I believe exists. All right. Judge Buick also took the position that since the defendant or the minor had no prior history with the court and had received no services from the court at that point in time, she did not feel that she could risk trying to put him through services at the juvenile level because he might not comply. How is that position or that finding consistent with the statutory considerations here for transfer? I believe her finding was that he might not comply and there might not be adequate time for him to actually achieve any type of rehabilitation. Michael Medivy testified that because of the defendant's age, she was, I believe, a few days away, three days away from being 19 at the time of this transfer hearing, many of the services were already foreclosed to him participating. That being the kind of inpatient residential treatment that was recommended by Dr. Braden or anything beyond community-based counseling. The court, Judge Buick, I believe, considered that these were serious offenses that stand a lengthy period of time and considered the circumstances of the offense in assessing what the rehab potential of the defendant would be. As I said, there's no denying that there was no evaluation done. She had no information regarding what his participation in services had been. There was some testimony that the defendant had taken medication and not taken medication. What is notable is that the defendant had, although he had claimed to have heard voices for years, he was working, he graduated high school, and had displayed no, according to my recollection, mental health concerns until after being discharged. I don't think it's inconsistent that he, well, I don't think there's a record that shows that she did not consider his mental health challenges. But there was no evidence that this was an ongoing, and in fact, his finding of the fitness was not that he couldn't understand the nature of the proceedings or anything like that. It was Dr. Braden simply said he was unfit because she felt, due to his depression, he couldn't participate with his attorneys. Correct. She could have ordered the sex offender evaluation sua sponte, couldn't she? Judge Bewick? Yes. Yes, I believe she could have. And the probation officer was pretty clear that they work with that instrument to determine potential rehabilitation issues. Isn't that correct? Correct. This case was not on a fast track by any stretch of the imagination with all of the delays because of fitness. What would have been the harm of ordering the sex offender evaluation? Michael Venditti testified that at the worst case scenario, I guess, it would take up to nine months to complete the sex offender evaluation and the social assessment. I believe the court may have viewed that as just ticking into the time when he could actually have been participating in services. So the fact that it hadn't been done, she could have sua sponte ordered it, but it may have been up to nine months before he was ever evaluated. And as Michael Venditti testified, if the evaluation showed that he needed treatment, intensive treatment, or more than just minimal treatment, the juvenile court's jurisdiction would expire shortly thereafter. So I think the court considered the circumstances of the offense as an indicator that this young man, this defendant, would not be relocated within the course of the juvenile court's jurisdiction. It seemed to be a rather significant issue that Illinois did not have any inpatient facilities for someone like the minor here because of his age at the time of the hearing. Was there anything that prevented the judge or the probation from looking outside the state of Illinois for facilities that would be of assistance to him in the time that was left? Okay, but that was not pursued in any way. Is that correct? Okay, let's go to beyond a reasonable doubt. If abuse did occur in the Blue House, it certainly would be unfortunate and would be tragic. But the Blue House was not available for any of this conduct, according to the indictments, because it was already sold. And I don't believe any of the testimony was brought in as prior bad acts or something of that nature. So how can we find any testimony about what happened in the Blue House credible in this case? Marco's testimony was that the contact had begun when he was in preschool. In the defendant's statements to Oscar Meeks, he did indicate that he had first began to touch Marco when he was 12 years old, which would put it within the timeframe prior to 2012. The fact that that conduct, I mean, it's not inconsistent with the date's charge. It's just conduct that, yes, it wasn't brought in as prior bad acts or anything, but it's conduct that occurred before they moved to the Yellow House. And it does not necessarily impugn Marco's credibility that Marco, a young child, made statements that abuse had occurred elsewhere, where he testified, you know, consistently, that he had been abused more than 10 times in the Yellow House during that charge period from 2013 to 2015. He also testified it only happened three times, and he didn't identify where. The point is, you used the word. I'm only going to now use it because you did. What was consistent about his testimony? His testimony was consistent with his, consistent with the other court statements or with his internal? With anything. Just take all of the statements he made over a period of time. Immediately after the television incident, then, you know, with the, I think it's Ms. Tunney at the advocacy center, and then, you know, to his parents again, and then in court. How, what's consistent? I need, can you point to one issue that's consistent that he testified to, other than that he was improperly touched? He testified that it occurred every weekend, beginning when he was in preschool, up until a week, or rather a month before the outcry, which was August 11, 2015. So those, that testimony was consistent. Then he made statements to his mother that the abuse had occurred also in the Blue House. It's the state's position that that's not inconsistent. Right, but the Blue House is not within the charging instruments timeframe. Do we agree on that? Correct. And the state did not. So he can't, he could not be found guilty of those charges pursuant to the indictment that's before this court. Correct. He mounted a defense based upon the location. Defendant mounted a defense. His theory was that the minor was not credible because, Marco was not credible, because he testified about some of the incidents occurring in the Blue House starting when he was in preschool. It's happenstance that there were two locations, but the charge defense was clearly, the defense clearly knew where he lived at that time, which was in the Yellow House. And Marco's statements, testimony rather, I should say, was consistent that he had been abused in the Yellow House during the charge time period more than 10 times. Thank you very much, Mr. Jacobs. And I have no further questions, Justice Bridges. Thank you, Justice Hutchinson. Justice Zinoff, do you have any questions? Just a couple. Counsel, with regard to the ineffective assistance of counsel argument for not filing the motion to suppress statements, isn't the statement of the attorney herself that she didn't want the judge to hear that evidence enough? To establish her ineffectiveness in and of itself? The statement in context of her testimony, yeah, it does, that is not a strategic decision, but the law shows that counsel's not charged with filing two-file motions. Counsel did state, in addition to saying that she didn't want the judge to hear, she said there was no basis for filing such a motion. Okay. Well, you mentioned in your argument, as you began today, that the trial court did comment on the seriousness of these offenses, and of course the transfer is a discretionary decision. The statutory language does say at the end of the list of all of the factors the judge is supposed to consider, it says in considering these factors, the court shall give greater weight to the seriousness of the alleged offense, a minor's prior record of delinquency, here he had none, than to the other factors listed in this subsection. Does that language in any way excuse the absence of the evidence regarding or getting a sex evaluation, or what treatment would have been available? I don't believe there's any requirement that any type of evaluation has to occur. The language that you quote, the court shall give greater weight to the seriousness of the alleged offense, a minor's prior record of delinquency, than to the other factors listed in this subsection, is mandatory that, and I do believe that it allows the court to look at the circumstances, seriousness of the alleged offenses, and determining rehabilitative potential. There are the requirements, the court was to consider whether there's a reasonable likelihood the minor can be rehabilitated before the expiration of juvenile court jurisdiction, and advantages of treatment within the juvenile justice system, etc. We've talked about that, and talked about how getting a sex evaluation may have assisted in satisfying and presenting evidence regarding these two factors, which was absent or scant at best. So I guess my question is, is the absence of evidence, or the existence of scant evidence on those factors, outweighed by the language in the statute that I just referred to? It's a safe position that it is. The advantages of treatment within the juvenile justice system were determined by the court, and the court found, based upon the testimony of Michael Venditti, that there was really no difference, no advantage to treatment within the juvenile justice system, other than that the defendant would have participated in, perhaps, outpatient treatment. However, that wasn't the recommendation of Dr. Brady, which was a recommendation for partial hospitalization and treatment. But yes, it's a safe position that the statute allows the court to assess the history and present circumstances of the defendants, based upon the seriousness of the alleged offenses, and that is what the court did in this case. All right, and do you agree with opposing counsel, agree with his answer that, with respect to the relief requested, if we find that this transfer hearing, if we reverse the decision below to transfer him, there is nothing more that could happen in juvenile court? I agree that juvenile court's jurisdiction has expired, yes. I believe his defendant is probably over 98, so he's over the age. Okay, thank you. I have no further questions. Thank you, Justice Zinoff. I have one question regarding the transfer. Based on Vendetti's testimony, a sex offender evaluation, it seems to me, was of tremendous importance, because if the evaluation found the defendant to be of a low risk, he could have been successfully rehabilitated well in advance, and that's the words he used, of the juvenile court losing jurisdiction. But none was given. Isn't that an important factor for the court? The court should have ordered this evaluation. It was important. I believe Michael Vendetti testified that, in usual practice, when the juvenile court filed juvenile court services, we would obtain sex-dependent evaluations. We would obtain a subcontractor to refer out the sex-dependent evaluations. As to the reason that he was filing this, he testified that he did not refer this case to the court for an evaluation. It was an important factor, but again, based on the statute, it does seem that the court considered the evidence that was before it, and gave greater weight to the seriousness of being much more offensive. At that point, he only knew that his minors had been allegations of sexual assault. As I said, they heard the determination based upon that evidence, and found that the protection of society outweighed the defendant's rehabilitation. Thank you. Okay. Thank you, Mr. Jacobson. I have no further questions. Justice Hutchinson, do you have any additional questions? No, thank you. And Justice Zinoff, do you have any additional questions? No, I don't. Thank you. Thank you. Mr. Singeland, do you wish to present a rebuttal? Yes, Mr. Justice. Thank you. Reference was made that the outcome of the trial may have been affected had the statement been suppressed. That requires taking a look at the evidence without the statement. Remember, as we commented before, the children's statements were vague and inconsistent. I would suggest a lot of testimony is improbable. Every weekend with the parents down the hallway, it's just an improbable scenario. Remember, there's no physical corroboration of the statements of the children. In fact, there is evidence in the record that the children, each of the children, denied any appropriate conduct. Marco testified, I don't remember, when first asked by his father. Bianca said nothing happened. She responded in the nurse's notes that I'd never been forced to do something that I did not want to do. So that's the evidence without the statement. And I question whether that would add up then to beyond a reasonable doubt. Secondly, there was testimony. Indeed, Mr. Venditti did testify that his experience was that it could take up to nine months to do a sex offender evaluation. It would be hard for me to believe that the court couldn't put that on a fast track. That was a concern that the court had about losing jurisdiction. Mr. Venditti said his department doesn't do sex offender evaluation. They farm it out to an agency. I would think that, I'm just speculating now, but I don't think nine months is a deterrent or is a good enough reason not to order the sex offender evaluation. The absence of information on rehabilitation does not equal evidence that the defendant does not have potential for rehabilitation. And as Justice Bridges pointed out, Mr. Venditti said he well in advance, well in advance, finished sex offender treatment in the right circumstance if he came back. Presumably if he came back as a low risk to recidivate. In terms of evidence, risk to the public, the defendant was free on bond for two years prior to the trial. No evidence of any criminal conduct during that time. In terms of the voluntariness of the statement that was referred to, the altercation or the confrontation, let me say this, the questioning by the police officer occurred on the same night that the children disclosed the event to the parents. It was a fast moving evening of, first of all, the children talking to the parents, then the parents recording the children, then the parents going over to Marco's parents, Alejandro's parents' house, playing the recordings for the parents. And then Marco being taken, Alejandro being taken off from work by his mother from work, sat down in the house and then confronted by the angry uncle. There was a time period, indeed, as referenced earlier, between the time that the police, that Alejandro was subject to the rant of the uncle and the arrival of the police department, that time period is not clear, but there was a period of time in between. But the house was not, as Alejandro testified, the house was not calm or quiet as it usually had been that night. That concludes my remarks. Thank you, counsel. Justice Hutchinson, do you have any questions? No, thank you, Justice Bridges. Justice Zinoff, do you have any additional questions? No, I do not. And I also have no further questions. So the court thanks both parties for your arguments this morning. The case will be taken under advisement and a disposition will be rendered in due course. Mr. Clerk, you may close the case and terminate the proceedings. Thank you. Thank you.